# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| BURNETT SPECIALISTS et al., | § | |
| | § | |
| *Plaintiffs,* | § | Civil Action No. 4:22-cv-00605 |
| v. | § | Judge Mazzant |
| | § | |
| JENNIFER A. ABRUZZO et al., | § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION & ORDER

Pending before the Court are Defendants National Labor Relations Board and General Counsel Jennifer A. Abruzzo's Motion to Dismiss Complaint for Lack of Jurisdiction (Dkt. #16) and Defendant United States of America's Motion to Dismiss Complaint and for Joinder (Dkt. #17). Having considered the motions and relevant pleadings, the Court finds that the motions should be **GRANTED**.

## BACKGROUND

On April 7, 2022, the General Counsel of the National Labor Relations Board ("NLRB"), Jennifer Abruzzo ("Abruzzo"), issued Memorandum GC 22-04 ("the Memorandum"), which was entitled "The Right to Refrain from Captive Audience and other Mandatory Meetings." In her Memorandum, Abruzzo explained that, under Section 7 of the National Labor Relations Act ("NLRA"), employers have the right to "refrain from listening to employer speech concerning the exercise of Section 7 rights," and forcing employees to listen to employer speech should qualify as an unfair labor practice (Dkt. #1, Exhibit 1 at p. 3).

Abruzzo then generally outlined the NLRB's historical practice of allowing employees to abstain from listening to employer speech regarding unionization. But that historical practice has

since changed—as the NLRB has concluded that an employer may compel its employees to attend meetings when the employer urges them to reject union representation.  However, Abruzzo explained her desire for the NLRB to change its stance.  Specifically, she noted that she would "ask the Board to reconsider current precedent on mandatory meetings in appropriate cases" and hold that employees need not attend employer meetings in certain circumstances (Dkt. #1, Exhibit 1 at p. 4).  Those circumstance are "when employees are (1) forced to convene on paid time or (2) cornered by management while performing their job duties" (Dkt. #1, Exhibit 1 at p. 3).

The Memorandum itself is a nonbinding policy letter from the General Counsel with no legal effect.  Yet, consistent with this Memorandum, the NLRB General Counsel's Office has started prosecuting cases for unfair labor practices where employees have convened during certain times touched on in the Memorandum.  These prosecutions are, in essence, the vehicle by which Abruzzo seeks to change the Board's position on certain classes of employer speech.

After Abruzzo issued the Memorandum, Plaintiffs filed a lawsuit in this Court against Abruzzo, the NLRB, and the United States of America.  Plaintiffs are staffing companies that operate throughout Texas, and they allege that (1) the Memorandum violates their First Amendment rights, and (2) the Memorandum is an ongoing violation of federal law that the Court may remedy by granting equitable relief (Dkt. #1).  Specifically, they assert that Abruzzo's Memorandum has a chilling effect on their speech and what they can tell their employees about unionization (Dkt. #1).

The NLRB and Abruzzo then filed a motion to dismiss for lack of subject-matter jurisdiction (Dkt. #16).  The NLRB and Abruzzo contend that (1) the NLRA precludes judicial review of Abruzzo's actions, (2) Plaintiffs are not challenging a final agency action within the

meaning of the Administrative Procedure Act ("APA"), and (3) Plaintiffs lack standing to otherwise bring a claim (Dkt. #16).   Thereafter, the United States of America filed a motion to dismiss for the same reasons articulated by the NLRB and Abruzzo (Dkt. #17).   Plaintiffs filed a response to Defendants' motions (Dkt. #19), and then the parties filed reply and sur-reply briefing (Dkt. #23); (Dkt. #26).   On August 11, 2023, the Court heard oral arguments on Defendants' pending motions and whether the Court had jurisdiction to entertain the current case.   The Court took the matter under advisement following the hearing.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) authorizes the dismissal of a case for lack of subject-matter jurisdiction when the district court lacks the statutory and constitutional power to adjudicate the case.   *See Home Builders Ass'n of Miss., Inc. v. City of Madison,* 143 F.3d 1006, 1010 (5th Cir. 1998).   When ruling on a motion to dismiss for lack of subject-matter jurisdiction, a court may consider: (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.   *Den Norske Stats Oljeselskap As v. HeereMac v.o.f.,* 241 F.3d 420, 424 (5th Cir. 2001); *see also Clark v. Tarrant Cnty.,* 798 F.2d 736, 741 (5th Cir. 1986) (citing *Williamson v. Tucker,* 645 F.2d 404, 413 (5th Cir. 1981)).   The Court will accept as true all well-pleaded allegations set forth in the complaint and construe those allegations in the light most favorable to the plaintiff.   *Truman v. United States*, 26 F.3d 592, 594 (5th Cir. 1994).   Once a defendant files a motion to dismiss under Rule 12(b)(1) and challenges jurisdiction, the party invoking jurisdiction has the burden to establish subject-matter jurisdiction.   *See Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980).

## ANALYSIS

As mentioned, Defendants argue that this case should be dismissed in its entirety because the Court lacks jurisdiction for several different reasons. The Court is inclined to agree because (1) the NLRA's structure precludes review of Abruzzo's Memorandum and (2) Plaintiffs lack standing to bring their claims of First Amendment chill. Thus, the Court will grant Defendants' motions to dismiss.

### I.  NLRA's Structure

For their first line of attack, Defendants maintain that the NLRA's statutory scheme compels the conclusion that a district court lacks jurisdiction to hear Plaintiffs' claims of First Amendment chill. Namely, they assert that Abruzzo's actions here are either unreviewable prosecutorial decisions or the NLRA's statutory scheme precludes district court jurisdiction. The Court is convinced that it lacks jurisdiction on both grounds. But to understand why, an overview of the NLRA is necessary.

#### A.  NLRA's Statutory Scheme

In 1935, Congress enacted the NLRA to encourage "'the practice and procedure of collective bargaining' between labor and management and to resolve 'industrial disputes arising out of differences as to wages, hours, or other working conditions.'" *Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Local Union No. 174*, 143 S. Ct. 1404, 1410 (2023) (quoting 29 U.S.C. § 151). In turn, the Act provides employees with certain rights. Section 7 of the NLRA "protects employees' rights 'to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.'" *Id.* at 1410 (quoting 29 U.S.C. § 157). Equally important, Section 7 allows employees to "refrain from any or all such activities"

4

as well.  29 U.S.C. § 157.  Section 8, meanwhile, forbids employers from engaging in any "unfair labor practice," which includes "interfering with employees' exercise of their § 7 rights."  *Glacier Nw.*, 143 S. Ct. at 1410 (citing 29 U.S.C. § 158(a), (b)).

"Congress has explicitly chosen the NLRB as its agent to enforce the National Labor Relations Act."  *Overstreet v. Apex Linen Holdings, LLC*, 618 F. Supp. 3d 1014, 1027 (D. Nev. 2022) (quoting *NLRB v. Cont'l Hagen Corp.*, 932 F.2d 828, 833 (9th Cir. 1991)).  Thus, Congress has determined that the Board has the authority to determine whether an unfair labor practice has occurred.  *Id.* (citing *Nathanson v. NLRB*, 334 U.S. 25, 30 (1952)).  Enforcement of unfair labor practices is "accomplished through a split-enforcement system, assigning all prosecutorial functions to the General Counsel of the NLRB and all adjudicatory functions to the Board."  *Beverly Health & Rehab. Servs., Inc. v. Feinstein*, 103 F.3d 151, 152 (D.C. Cir. 1996) (citing *NLRB v. United Food & Com. Workers Union, Local 23 (UFCW)*, 484 U.S. 112, 123–28, 108 S. Ct. 413, 420– 24 (1987)).

Under the NLRA, the unfair labor practice process begins when a private party files a "charge" alleging an unfair labor practice.  *Id.* at 152–53 (citing *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 138 (1975)); *see also Kent Corp. v. NLRB*, 530 F.2d 612, 615 (5th Cir. 1976).  The General Counsel then evaluates whether a "complaint" should be filed based on the charge.  *Kent Corp.*, 530 F.2d at 615.  The decision to bring a complaint is solely within the General Counsel's discretion, and the Board may not adjudicate a case until the General Counsel has done so.  *Id.*; *see also Beverly Health & Rehab Servs.*, 103 F.3d at 153.  The General Counsel's complaint has no legal effect upon an employer, and it is ultimately disposed of through an informal settlement agreement or formal adjudication before the Board itself.  *Beverly Health & Rehab Servs.*, 103 F.3d at 153.  When

the Board issues a final order, it is appealable to a United States Court of Appeals, not a district court.  *Id.*; 29 U.S.C. § 160(f).  But if the General Counsel does not issue a complaint, a private party "can obtain neither adjudication nor remedy under the labor statute . . . ."  *Kent Corp.*, 530 F.2d at 615; *see also Beverly Health & Rehab Servs.*, 103 F.3d at 153.

Taking matters further, judicial review of the General Counsel's decision-making is limited.  Under the NLRA, the General Counsel "shall have final authority, on behalf of the Board, in respect of the investigation of charges and issuance of [administrative] complaints . . . and in respect of the prosecution of such complaints before the Board . . . ."  29 U.S.C. § 153(d).  These prosecutorial decisions include "the 'exercise of general supervision' over officers and employees in the NLRB (excepting administrative law judges and legal assistants to the Board), 'investigation of charges,' 'issuance of complaints,' and 'prosecution of such complaints.'"  *Exela Enter. Sols., Inc. v. NLRB*, 32 F.4th 436, 443–44 (5th Cir. 2022) (cleaned up) (quoting 29 U.S.C. § 153(d)).  "No provision of the Act provides for judicial review of any of these prosecutorial functions."  *Beverly Health & Rehab Servs.*, 103 F.3d at 153.  But, on the other hand, "the Act specifically provides for judicial review of 'final orders of the Board.'"  *Id.* (internal brackets omitted) (quoting 29 U.S.C. § 160(e)).  As such, the Supreme Court has concluded that the NLRA "cannot be read to provide for judicial review of the General Counsel's prosecutorial function."  *UFCW*, 484 U.S. at 129.

**B.  Application to Defendants' Motions**

With this background, the Court finds that it lacks jurisdiction here because (1) Plaintiffs are challenging the General Counsel's prosecutorial decisions and (2) the NLRA's scheme yields the conclusion that Plaintiffs' claims should be funneled through the statutory system.

### i.   The Memorandum and Abruzzo's Prosecutions are Unreviewable.

Starting with the first conclusion, the Court finds that it cannot review Abruzzo's actions because they are prosecutorial decisions.  And Plaintiffs have not shown that the Court otherwise has jurisdiction to review them.

Before going any further, it is important to ask: How are Plaintiffs challenging a prosecutorial decision?  Plaintiffs, of course, are not enveloped in an unfair labor practice proceeding, so it seems that the NLRA's scheme has no application to them.  But the Court is unconvinced that is the case.

Although Plaintiffs have refrained from coloring their claims as challenging potential unfair labor practices, it is clear that it is their ultimate goal.  Plaintiffs admit that their speech regarding unionization is chilled since Abruzzo announced her interpretation of unfair labor standards in her Memorandum (Dkt. #1 at p. 6).  However, their speech is only chilled in the sense that they fear an unfair labor practice claim may be filed against them.  Abruzzo cannot prosecute Plaintiffs until a charge is filed against them, which must be done by a private party, and her decision to issue a complaint has no binding effect like a final rule would.  *See Beverly Health & Rehab Servs.*, 103 F.3d at 153; *see also Kent Corp.*, 530 F.2d at 615.  Furthermore, the Memorandum itself carries no binding effect whatsoever on Plaintiffs either.  Accordingly, since Plaintiffs seek to enjoin prosecutions of unfair labor practices, the NLRA's statutory scheme is undoubtedly relevant.  *Compare Amerijet Intern., Inc. v. NLRB*, 520 F. App'x 795, 796 (11th Cir. 2013) (finding NLRA's statutory scheme precluded review in action seeking to enjoin NLRB from investigating a labor charge), *with Am. Fed'n of Labor & Cong. of Indus. Organizations v. NLRB*, 57 F.4th 1023, 1032 (D.C. Cir. 2023) (holding statutory scheme for unfair labor practices did not apply to plaintiff's claim because "unfair labor practices—whether specifically or in general—[were] not at issue" in pre-

enforcement challenge to NLRB's final rule dealing with elections regarding union representation).

To that end, the Memorandum, and by proxy, the General Counsel's decision to prosecute certain cases are unreviewable actions. No matter how one wants to construe these actions, they qualify as (1) Abruzzo's decision to bring certain types of complaints after a charge is filed; (2) Abruzzo's decision to investigate certain unfair labor practice charges; or (3) supervision over her own general staff within the General Counsel's office. Thus, they are quintessential prosecutorial functions, and they cannot be reviewed. *See Exela Enter. Sols.*, 32 F.4th at 443 (cleaned up) (quoting 29 U.S.C. § 153(d)) ("[T]he NLRA created the General Counsel to perform quintessentially prosecutorial functions, including the 'exercise of general supervision' over officers and employees in the NLRB . . . 'investigation of charges,' 'issuance of complaints' and 'prosecution of such complaints.'"); *see also Am. Fed'n of Gov't Employees Local 1749 v. Fed. Labor Relations Auth.*, 842 F.2d 102, 105 (5th Cir. 1988) (quoting *Sears, Roebuck & Co.*, 431 U.S. at 138) ("The NLRB General Counsel has 'the unreviewable authority to determine whether a complaint shall be filed.'").

In fact, Plaintiffs do not even attempt to argue that Abruzzo's Memorandum is outside of her prosecutorial functions. Nor did they try to do so at oral argument. This concession is fatal: prosecutorial functions are simply unreviewable. *See UFCW*, 484 U.S. at 130 ("As the decision in this case was 'prosecutorial,' it cannot be judicially reviewed under the NLRA."); *see also Amerijet Intern.*, 520 F. App'x at 796 (dismissing declaratory judgment action that NLRB lacked jurisdiction to investigate an employee charge because the NLRA "commits to the NLRB's General Counsel the unreviewable authority to initially investigate unfair labor practice charges"). As such,

Plaintiffs' claims are foreclosed; they cannot challenge the General Counsel's prosecutorial decision-making here.[1]

Of course, the General Counsel's decisions are not without limits. In *Leedom v. Kyne*, 358 U.S. 184 (1958), "the Supreme Court outlined 'only a narrow and rarely successfully invoked exception to the doctrine that exhaustion of administrative procedures is a condition precedent to federal court jurisdiction.'" *Sanderson Farms, Inc. v. NLRB*, 651 F. App'x 294, 297 (5th Cir. 2016) (quoting *United States v. Feaster*, 410 F.2d 1354, 1368 (5th Cir. 1969)). For the exception to apply, (1) an agency must exceed the scope of its delegatory authority or violate a clear statutory mandate and (2) the aggrieved party must be deprived of a meaningful opportunity for judicial review. Yet, *Kyne* is of no use to Plaintiffs because they cannot point to any statutory mandate that Abruzzo violated by filing the Memorandum, which is in essence a policy letter. *See id.* Furthermore, Abruzzo's filing of certain types of cases is a prosecutorial function, and that is unreviewable. *See id.* (citing *UFCW*, 484 U.S. at 129) (finding *Kyne* did not apply to Board's exercise of prosecutorial discretion).

With *Kyne* serving no use, Plaintiffs also claim there is another category of cases—so called "*Larson* claims" that allow review here. "Under the *Larson* doctrine, there are two types of suits that can proceed against federal officers in their official capacities: (1) suits alleging a federal official acted *ultra vires* of statutorily delegated authority; and (2) suits alleging 'the statute or order

---

[1] It is telling that Plaintiffs largely ignore the body of case law on this subject. For example, Plaintiffs argue that Abruzzo's prosecutorial decisions should be considered "final agency" action because her decisions have legal ramifications (Dkt. #19 at pp. 12–14). Thus, her positions in her Memorandum can be challenged. Plaintiffs are not the first parties to try this strategy. In *UFCW*, the Supreme Court rejected an identical argument under different circumstances. There, the respondent argued that, even if the NLRA provides for no judicial review of a prosecutorial decision, the decision can still be challenged under the APA because the decision is a final agency action. *UFCW*, 484 U.S. at 130. The Court declined to adopt the respondent's argument, noting that the respondent's position was contrary to the NLRA's structure. *Id.* at 130–33.

conferring power upon the officer to take action in the sovereign's name is claimed to be unconstitutional." *Leal v. Azar*, 489 F. Supp. 3d 593, 599 (N.D. Tex. 2020) (quoting *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689–90, (1949)), *vacated in part, appeal dismissed in part sub nom. Leal v. Becerra*, No. 20-11083, 2021 WL 5021034 (5th Cir. June 3, 2021).

Still, the Court does not find this argument compelling.  For one, *Larson* seems to merely encompass the same concerns in *Kyne*, which as discussed, does not support jurisdiction here.  And there is an open question on whether the APA abrogated the doctrine that *Larson* espoused.  *Id.* ("It is an open question whether the 1976 amendments to the APA abrogated the *Larson* doctrine in suits against federal agency officials (collecting cases)).  At any rate, *Larson* does not support jurisdiction in this case because there is no allegation that Abruzzo acted outside her statutory authority or that the NLRA does not give her the right to prosecute certain cases.

In sum, the Court is convinced that Abruzzo's Memorandum, and her decision to prosecute certain cases that implicate potential coercive employer speech, are matters firmly within her discretion.  Therefore, the decisions cannot be reviewed.  If this were not enough, however, the Court nevertheless would find that it lacks jurisdiction for another reason.

### ii.   The NLRA's Scheme of Reviewing Unfair Labor Practices Also Precludes Jurisdiction

Separate from the discussion on prosecutorial decisions, the Court also finds that it lacks jurisdiction because the NLRA's statutory scheme precludes a district court from hearing Plaintiffs' specific claims.  Usually, the Court would have jurisdiction over Plaintiffs' First Amendment claims because federal district courts have "jurisdiction over '*all* civil actions arising under the Constitution.'" *Cochran v. U.S. Sec. & Exch. Comm'n*, 20 F.4th 194, 199 (5th Cir. 2021) (en banc) (emphasis in original) (quoting 28 U.S.C. § 1331), *aff'd and remanded sub nom. Axon*

*Enter., Inc. v. Fed. Trade Comm'n*, 143 S. Ct. 890 (2023).  But Congress, of course, "can limit district court jurisdiction if it so chooses."  *Id.* at 200 (citing *Sheldon v. Sill*, 29 U.S. 441, 449 (1850)).  This limitation can be accomplished implicitly, such as when Congress specifies for "review in a court of appeals following the agency's own review process," like the NLRA does for unfair labor practice claims.  *Axon Enter.*, 143 S. Ct. at 900.

To determine whether a statute prevents judicial review, the Court engages in a two-step process.  *Cochran*, 20 F.4th at 206 (citations omitted).  First, the Court looks at whether "a statutory scheme displays a fairly discernible intent to limit jurisdiction," then second, the Court examines "whether the claims at issue are of the type Congress intended to be reviewed within the statutory structure."  *Id.* (cleaned up) (quoting *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 489, 130 S. Ct. 3138, 3150 (2010)).  On this second step, the Courts looks at three different factors, known as the *Thunder Basin* factors, which entails an examination of (1) whether a finding of preclusion would foreclose "all meaningful judicial review," (2) whether the plaintiff's suit is "wholly collateral" to the statute's review provisions, and (3) whether the claims are outside the agency's expertise.  *Id.* (quoting *Free Enter. Fund*, 561 U.S. at 489); *Axon Enter.*, 143 S. Ct. at 900.  If all three factors favor an answer of "yes," then it is presumed Congress did not intend to restrict district courts' jurisdiction, but the same result may be reached if the factors point in different directions.  *Axon Enter.*, 143 S. Ct. at 900–01.

Turning to the first step, the Court has no trouble in concluding that the NLRA displays an intent to limit jurisdiction.  Remember the relevant statutory scheme is the review of an unfair labor practice.  That scheme does not allow for district court review of an unfair labor practice; the proceedings go to the Board, and then the Board's final order is appealable to an appropriate circuit

court of appeals. *Beverly Health & Rehab Servs.*, 103 F.3d at 153.  In setting up the procedure this way, Congress made clear the NLRA "is meant to be, and is, a comprehensive statute concerning the disposition and review of the merits of unfair labor practice charges." *UFCW*, 484 U.S. at 131. Thus, the statute intends to limit district court jurisdiction.  And as previously discussed, the Court finds that it is indeed relevant to Plaintiffs' claims since Plaintiffs are essentially seeking to enjoin an unfair labor practice proceeding, if not an unfair labor practice charge altogether. *See Amerijet Intern., Inc.*, 520 F. App'x at 796.

Having found that the NLRA's statutory scheme intends to limit jurisdiction, the question becomes whether the NLRA's scheme covers the precise claims that Plaintiffs bring. *Cochran*, 20 F.4th at 206.  However, before delving into the *Thunder Basin* factors, it is instructive to compare two Supreme Court cases that considered whether a statute extended to certain claims.  *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 216 (1994); *Axon Enter.*, 143 S. Ct. at 906.

In *Thunder Basin* (which the factors here are named after), the Court found the statutory scheme did so extend.  510 U.S. at 216.  There, a company that was subject to the Mine Act refused to provide employee-designated union officials with access to the workplace, which the statute required.  *Id.* at 204–06.  The Mine Act had a detailed enforcement scheme for companies that violated the statute.  *Id.* at 207.  If a company violated the Act, it would be issued a citation, then the company could contest the citation to a mine safety commission and appeal the commission's decision (if necessary) to a court of appeals.  *Id.* at 207–09.  Rather than comply with those procedures, the company in *Thunder Basin* filed a pre-enforcement lawsuit in district court, alleging violations of its due process rights and its rights under the NLRA.  *Id.* at 204–06.  Pointing to the Mine Act's detailed administrative scheme, the Supreme Court held that the district court

should not have adjudicated the coal company's claims, noting that "[n]othing in the language and structure of the Act or its legislative history suggests that Congress intended to allow mine operators to evade the statutory-review process by enjoining the Secretary from commencing enforcement proceedings, as petitioner sought to do here." *Id.* at 216.

On the other hand, the Supreme Court recently reached the opposite conclusion in *Axon*. 143 S. Ct. at 906.  In *Axon*, the plaintiffs were involved in enforcement actions brought by the Securities and Exchange Commission ("SEC") and Federal Trade Commission ("FTC").  *Id.* at 898–99.  Before those proceedings occurred, the plaintiffs filed lawsuits in district court, arguing that the administrative-law judges in the respective agencies were insufficiently accountable to the President.  *Id.*  Thus, the plaintiffs argued that they were being subjected to unconstitutional proceedings.  *Id.*  The administrative scheme implicated in *Axon* was similar to the NLRA and the one in *Thunder Basin*. Both the SEC and FTC could enforce statutory violations by instituting administrative proceedings in front of an administrative-law judge, and the judge's decision would be appealed to the respective agency.  *Id.* at 898.  If appealed, the FTC and SEC then issued a final decision, and those claims were appealed to a court of appeals—not a district court.  *Id.* Nevertheless, the Supreme Court held that the plaintiffs' constitutional challenges could be brought in district court. *Id.* at 906.  Distinguishing the case from *Thunder Basin*, as well as other past decisions, the Court emphasized:

> The challenges here . . . are not to any specific substantive decision—say, to fining a company (*Thunder Basin*) or firing an employee . . . Nor are they to the commonplace procedures agencies use to make such a decision.  They are instead challenges . . . to the structure or very existence of an agency: They charge that an agency is wielding authority unconstitutionally in all or a broad swath of its work.

13

*Id.* at 902.  And because that structural argument would call into question the very nature of being subjected to a proceeding at all, the Court viewed the relevant statutory schemes as inapplicable to the plaintiffs' "sweeping constitutional claims."  *Id.* at 902.

From these two decisions, a helpful distinction comes to light as it relates to Plaintiffs' First Amendment claims.  Here, Plaintiffs are not challenging the NLRB's existence or its structure.  Instead, they are arguing that Abruzzo's "substantive decision" or "a commonplace procedure" the NLRB uses violates their constitutional rights.  *See id.*  As a result, this case is more like *Thunder Basin* than it is *Axon*.

It, therefore, appears that Plaintiffs' claims cannot go forward, as the same concerns in *Thunder Basin*—and not *Axon*—are at issue here.  But focusing on the *Thunder Basin* factors only reinforces this conclusion.  Once more, those factors are (1) whether a finding of preclusion would foreclose "all meaningful judicial review," (2) whether the plaintiff's suit is "wholly collateral" to the statute's review provisions, and (3) whether the claims are outside the agency's expertise. *Cochran*, 20 F.4th at 206.

Taking the factors in reverse order, we can start with whether Plaintiffs' claims are within the NLRB's expertise.  *See Axon*, 143 S. Ct. at 905–06.  They are.  Plaintiffs assert that Abruzzo's Memorandum chills their First Amendment rights to give noncoercive speech about union representation.  Deciding whether certain speech is coercive is a matter firmly within the NLRB's expertise.  An employer's right to give noncoercive speech about labor practices is not unique to the First Amendment—it is embodied in the NLRA itself.  *See Chamber of Com. of U.S. v. Brown*, 554 U.S. 60, 67 (2008) (noting that, at 29 U.S.C. § 158(c), the NLRA protects employer's noncoercive speech from an unfair labor practice and some believe this section "merely

14

implements the First Amendment" (quoting *NLRB v. Gissel Packaging Co.*, 395 U.S. 575, 617 (1969)).   In that vein, the NLRB is often called upon to determine whether certain speech is coercive or not and the NLRB possess unique expertise on the issue.   *NLRB v. Federbush Co.*, 121 F.2d 954, 957 (2d Cir. 1941) (reviewing NLRB decision that implicated employer speech and noting NLRB is "vested with power" to measure employer's speech against employees' rights to unionize); *Dayton Newspapers, Inc. v. NLRB*, 402 F.3d 651, 660 (6th Cir. 2005) ("In assessing the coercive impact of the employer's statements, we defer to the NLRB's judgment and expertise." (citations omitted)); *Cook Paint & Varnish Co. v. NLRB*, 648 F.2d 712, 719 (D.C. Cir. 1981) ("[T]his court has stressed . . . that the [NLRB] possesses an unmatched expertise in distilling and identifying the coercive effects of employer conduct." (citation omitted)).   Additionally, even if a plaintiff generally raises a constitutional claim, a plaintiff's claims can still concern matters where an agency has expertise.   *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 23 (2012).   Specifically, in *Elgin*, the Supreme Court highlighted that "preliminary questions" which the agency had expertise over "may obviate the need to address the constitutional challenge."   567 U.S. at 22–23.   Similarly here, the NLRB has expertise in deciding a wide range of issues in the unfair labor practice context and may not even address Plaintiffs' First Amendment claims.   For these reasons, Plaintiffs' claims concern a matter firmly within the NLRB's expertise.

Next, we consider whether Plaintiffs' claims are "wholly collateral" to the NLRA's review provisions.   *Id.* at 904.   In *Cochran*, the Fifth Circuit suggested this factor "depends on whether [the statutory] scheme is intended to provide the sort of relief sought by the plaintiff."   20 F.4th at 207 (citing *Elgin v. Dep't of Treasury*, 567 U.S. at 22); *see also Axon*, 143 S. Ct. at 904 (deciding whether claims were "wholly collateral" and considering relief sought by the plaintiffs).   Here, the

relief Plaintiffs seek is to avoid liability for an unfair labor practice—which is what the NLRA is specifically intended to address. *See UFCW*, 484 U.S. at 131. Plaintiffs' First Amendment claims are merely the vehicle by which they challenge a potential unfair labor practice, which does not change the character of the relief that they seek. *See Elgin*, 567 U.S. at 22 ("As evidenced by their district court complaint, petitioners' constitutional claims are the vehicle by which they seek to reverse the removal decisions, to return to federal employment, and to receive compensation . . . A challenge to removal is precisely the type of personnel action regularly adjudicated by the MSPB and the Federal Circuit within the CSRA scheme."). Thus, this factor again favors preclusion.

Finally, we must account for whether preclusion would foreclose all meaningful judicial review. *Axon*, 143 S. Ct. at 902–03. The Supreme Court has made clear that "adequate judicial review does not usually demand a district court's involvement," and review in a court of appeals "can alone 'meaningfully address' a party's claims." *Id.* at 903 (cleaned up) (quoting *Thunder Basin*, 510 U.S. at 215). Here, the NLRA provides for judicial review in a court of appeals for any unfair labor practice claim, so presumably Plaintiffs have a meaningful avenue for relief. Where lies the rub then?

From Plaintiffs' perspective, the strongest argument on this factor would come from the Supreme Court's decision in *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477 (2010). There, the Supreme Court held that the statutory review scheme did not provide meaningful relief because the plaintiffs were enmeshed in an investigation by the Public Company Accounting Oversight Board, but there was no guarantee that their claims could be reviewed since the statutory scheme "provides only for judicial review of *Commission* [SEC] action." *Id.* at 490.

16

In the case at hand, those same concerns are present—as the General Counsel's Memorandum is not otherwise reviewable under the NLRA. So, at first glance, *Free Enterprise Fund* supports reviewing Plaintiffs' claims. But digging deeper, *Free Enterprise Fund* only favors Plaintiffs on the surface and really has no application here.

For context, *Free Enterprise Fund* involved plaintiffs who were challenging the very existence of the Public Company Accounting Oversight Board, arguing that the Board's freedom from presidential oversight rendered unconstitutional every act or power the Board exercised. *Id.* at 508. In emphasizing that judicial review was not afforded to the plaintiffs, the Supreme Court highlighted that the plaintiffs "object[ed] to the Board's existence, not to any of its auditing standards," as such the plaintiffs' claims were "collateral" to any Commission rule or orders from which review might be sought. *Id.* at 490. What *Free Enterprise* instructs, therefore, is that the availability of judicial review depends exactly on the type of claim that Plaintiffs bring. *See id.* In fact, the Fifth Circuit clarified this exact principle in *Cochran*:

> *Thunder Basin* and *Elgin* both held that even if the agency was incapable of adjudicating a constitutional claim, meaningful judicial review was still available in the court of appeals. *Thunder Basin*, 510 U.S. at 215, 114 S.Ct. 771; *Elgin*, 567 U.S. at 17, 132 S.Ct. 2126. Yet this rule cannot be absolute: even though § 78y similarly provides for eventual court of appeals review, in *Free Enterprise Fund*, the Supreme Court held that the accounting firm "could [not] meaningfully pursue [its] constitutional claims." 561 U.S. at 490, 130 S.Ct. 3138. The key question is why *Free Enterprise Fund* had an outcome different from those in *Thunder Basin* and *Elgin*.

> The answer is that the *Thunder Basin* and *Elgin* plaintiffs sought substantive relief, while the *Free Enterprise Fund* accounting firm sought structural relief: while the mine operator in *Thunder Basin* ultimately desired to avoid potential harm from third parties (the miners), 510 U.S. at 215, 114 S.Ct. 771, the accounting firm in *Free Enterprise Fund* asserted that it was harmed by being investigated by a constitutionally illegitimate agency . . . .

17

*Cochran*, 20. F.4th at 208.

Now, let us shift back to the exact claims that Plaintiffs allege, and what harms they face. Plaintiffs here allege a violation of their First Amendment rights, but only because they may face an unfair labor practice. And, as outlined above, they will get the opportunity to redress that injury (if any) to the court of appeals. Consistent with *Thunder Basin*, therefore, this factor leans toward preclusion—not against it as *Free Enterprise Fund* may suggest. *See Thunder Basin*, 510 U.S. at 215 ("[P]etitioner's statutory and constitutional claims here can be meaningfully addressed in the Court of Appeals.").

Indeed, the facts in this case are jarringly similar to the exact situation faced in *Thunder Basin*. In holding that the plaintiffs' claims were barred by the Mine Act's statutory scheme, the Supreme Court emphasized that the plaintiff's claims were "pre-enforcement only because the company sued before a citation was issued . . . Had petitioner persisted in its refusal to post the designation, the Secretary would have been required to issue a citation and commence enforcement proceedings." *Id.* at 216. Stepping through the relevant factors, the Court concluded that "[n]othing in the language and structure of the [Mine] Act or its legislative history suggests that Congress intended to allow mine operators to evade the statutory-review process by enjoying the Secretary from commencing enforcement proceedings, as petitioners sought to do here." *Id.*

Likewise, Plaintiffs are attempting to do the same here. *Id.* And the Court does not have the power to enjoin the General Counsel's enforcement process. Carefully considering the *Thunder Basin* factors, as well as the NLRA's scheme for unfair labor practices, the Court does not have jurisdiction over Plaintiffs' claims.

## II.     Plaintiffs Also Lack Standing

Putting aside the Court's concerns with the NLRA's statutory structure, the Court does not have jurisdiction for another reason.  Plaintiffs lack standing.

"Under the Constitution, one element of Article III's 'Cases' and 'Controversies' requirement is that a plaintiff must establish standing to sue."  *Glass v. Paxton*, 900 F.3d 233, 238 (5th Cir. 2018) (quoting *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 408 (2013)).  There are three elements to standing that a plaintiff must show: (1) injury in fact, (2) a sufficient "causal connection between the injury and the conduct complained of" and (3) "a likelihood that the injury will be redressed by a favorable decision."  *Id.* (cleaned up) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).  While Article III's injury requirement is relaxed for cases of First Amendment chill, it does not mean that Article III's requirements go away altogether.  *Freedom Path, Inc. v. Internal Revenue Serv.*, 913 F.3d 503, 507 (5th Cir. 2019) (citing *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 754 (5th Cir. 2010)).

To show an injury in fact for claims of First Amendment chill, the Court considers "(1) whether the plaintiff intends to engage in a course of conduct arguably affected with a constitutional interest; (2) whether that conduct is arguably proscribed by the challenged policy; and (3) whether the threat of future enforcement is substantial."  *Tex. State LULAC v. Elfant*, 52 F.4th 248, 256 (5th Cir. 2022) (citing *Barilla v. City of Hous., Tex.*, 13 F.4th 427, 431 (5th Cir. 2021)).  A plaintiff's complaint of chill must meet all three elements in order to show an injury in fact.  *Id.*  But here, Plaintiffs cannot satisfy the third element.

It is not exactly clear what Plaintiffs' arguments are on the third element.  However, based on the contentions presented at oral argument, it seems they argue that they fear an unfair labor practice charge will be filed against them if they act contrary to the Memorandum.  Yet this

argument misses the mark in demonstrating whether the threat of future enforcement is substantial.

While a "threat of prosecution" can satisfy the third element, that threat still must be a "credible" one. *Id.* Indeed, parties "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impeding." *Glass*, 900 F.3d at 239 (quoting *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 416 (2013)). To evaluate whether a threat is "certainly impending," the Court examines the relationship between (1) the potential harm and (2) the chain of contingencies that must occur before that harm occurs. *Id.* at 238–39; *Elfant*, 52 F.4th at 257.

Here, the potential harm is an unfair labor practice violation. Now, consider the contingencies that must occur between that harm and any violation of the Memorandum: (1) Plaintiffs' employees begin a unionization effort; (2) Plaintiffs hold a type of employee meeting that is touched on in the Memorandum; (3) an employee takes offense to the meeting and institutes an unfair labor practice charge against Plaintiffs; (4) the General Counsel's Office investigates the complaint and determines charges should be filed; (5) the General Counsel's Office prosecutes the case; and (6) the NLRB reverses course on its current interpretation of what types of meetings qualify as an unfair labor practice. Most of these contingencies are not even remotely close to "certainly impending." So, Plaintiffs cannot show they face a threat of future enforcement either. *See Elfant*, 52 F.4th at 257 (list of six contingencies did not lead to reasonable threat of Plaintiffs being prosecuted); *Zimmerman v. City of Austin, Tex.*, 881 F.3d 378, 390 (5th Cir. 2018) (holding no injury because risk of prosecution depended "in large part on the actions" of third parties).

To be sure, some cases hold that the Court must "presume a credible threat of prosecution [when there] is a pre-enforcement challenge." *Elfant*, 52 F.4th at 257 (citing *Barilla*, 13 F.4th at 432). But that presumption only applies to "pre-enforcement challenges to recently enacted (or, at least, non-moribund) *statutes* that *facially restrict expressive activity* by the class to which the plaintiff belongs." *Id.* (emphasis added) (quoting *Barilla*, 13 F.4th at 432). As touched on above, the Memorandum is not legally binding and does not facially restrict any conduct. Thus, the presumption does not apply. At any rate, the Fifth Circuit has suggested that this presumption can be rebutted by contrary evidence, including if there are numerous contingencies that would need to occur before a plaintiff faces the respective harm. *Id.* at 257 n.6 ("Even if the presumption applied, it can be rebutted by compelling contrary evidence . . . Such evidence abounds here, given the number of stars that would have to align before Plaintiffs could be prosecuted for violating S.B. 1111."). Given the speculative contingencies that would need to occur before an unfair labor practice was levied against Plaintiffs, the Court finds that there is sufficient contrary evidence rebutting any presumption of a credible threat of prosecution.

\* \* \*

For the foregoing reasons, the Court concludes that it lacks jurisdiction to hear the present case. This Court is not the appropriate forum to adjudicate Plaintiffs' First Amendment claims.

## CONCLUSION

It is therefore **ORDERED** that Defendants National Labor Relations Board and General Counsel Jennifer A. Abruzzo's Motion to Dismiss Complaint for Lack of Jurisdiction (Dkt. #16) and Defendant United States of America's Motion to Dismiss Complaint and for Joinder

(Dkt. #17) are hereby **GRANTED** and the case is hereby **DISMISSED WITHOUT PREJUDICE.**

The Court will render a Final Judgment consistent with this Memorandum Opinion and Order separately.

All relief not previously granted is hereby **DENIED.**

**IT IS SO ORDERED.**

**SIGNED this 31st day of August, 2023.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE